# Exhibit 2



# C L A R E   L O C K E
L L P

**ELIZABETH M. LOCKE, P.C.**
libby@clarelocke.com
(202) 628-7402

**DANIEL P. WATKINS**
daniel@clarelocke.com
(202) 628-7407

10 Prince Street
Alexandria, Virginia 22314

(202) 628-7400

www.clarelocke.com

December 7, 2020

**Via Email and Federal Express**

Mr. Timothy FitzGerald
Chairman, President and CEO
The Middleby Corporation
1400 Toastmaster Drive
Elgin, Illinois 60120
TFitzgerald@middleby.com

> **Re:**   **Taylor Company's Fraudulent Concealment of Known Software Bugs and Related Smear Campaign Against Kytch.**

Dear Mr. FitzGerald:

My law firm represents Frobot, Inc., and its affiliate entity, Kytch.

This letter serves as notice to The Middleby Corporation ("Middleby Corp.") that its subsidiary Taylor Commercial Foodservice, LLC[1] has engaged in a pattern of unlawful and anti-competitive business activities.  Specifically, Taylor falsely claimed that Kytch's device "presents a safety risk" and "can cause serious human injury."  Taylor then threatened to breach its customers' product warranties unless they stopped using Kytch in their restaurants.

Make no mistake, documentary evidence confirms that Taylor's statements are false.  Kytch's products are not dangerous—indeed, they were specifically designed to complement and enhance the features of Taylor's machines.  There has never been a single report of an adverse safety event in company history.  But Taylor knew these facts all along because it collaborated with Kytch founders Jeremy O'Sullivan and Melissa Nelson years before they launched the company.  Still, Taylor chose to disregard the truth because Kytch's innovative offerings threatened to expose Taylor's scheme to profit off of software bugs by requiring customers to pay costly—and completely unnecessary—fees to Taylor's service business.

---

[1] This organization conducts business under the trade name Taylor Company ("Taylor").



For these reasons and those set forth more fully below, Kytch formally demands that Middleby Corp. intervene and require Taylor to (1) cease and desist using software that causes unnecessary product malfunctions; (2) retract its false claims that Kytch's products are unsafe and that they void Taylor's warranties;  (3) issue a public apology acknowledging that Kytch's products are safe; (4) discontinue its unlawful, anti-competitive conduct; (5) return all Kytch devices that Taylor has illegally obtained; and (6) compensate Kytch for the permanent and irreparable damage caused by Taylor's smear campaign.[2]

I.     **Taylor's Long History of Manufacturing Defective Ice Cream Machines and Failure to Resolve Known Functionality Problems and Software Bugs.**

Taylor manufactures soft-serve machines that multinational fast-food companies use in their quick-serve restaurants ("QSRs").   Two of its highest-paying customers are McDonald's and Burger King, and Taylor's machines are used throughout the world.  Despite its outsized market-share, Taylor's soft-serve machines have been known to be unreliable and "notorious for constantly breaking down."[3]  A recent article in *The Wall Street Journal* explained that "[t]he interruption in ice cream, milkshake, and McFlurry service is so widespread that it has spawned an avalanche of social-media complaints in the U.S. and abroad—and conspiracy theories."[4]  Other newspapers have printed similar stories.



---

[2] For the avoidance of doubt, this constitutes Frobot's and Kytch's formal retraction demand under applicable statute or rule of court.

[3] Shoshy Cement, *McDonald's and Burger King Franchisees Are Raving About a New Device that Can Update Their Notoriously Broken Soft-Serve Machines*, BUSINESS INSIDER (Feb. 11, 2020, 6:22 a.m.), https://www.businessinsider.com.au/mcdonalds-burger-king-soft-serve-machines-getting-tech-upgrade-2020-2.

[4] Julie Jargon, *Why Is the McFlurry Machine Down Again?*, THE WALL STREET JOURNAL (Jan. 19, 2017, 11:41 a.m.), https://www.wsj.com/articles/six-horrifying-words-the-mcflurry-machine-is-down-again-1484840520.



Indeed, the machines[5] malfunction so frequently that mocking the problems with soft-serve ice cream at McDonald's has turned into something of a cultural phenomenon.  Taylor has responded to these widespread complaints by trying to deny responsibility.  Company leadership has recently claimed that the problems resulted from "human error" or a debunked "heat cycle" theory.  Even Taylor COO James Minard has taken to social media platforms to try to discredit *The Wall Street Journal's* reporting on the matter.



        Taylor's pattern of denial continued for years—until a software engineer launched McBroken, a website that compiles statistics reflecting the number of soft-serve machines that are out of commission at any one moment.  At the time of this writing, for instance, McBroken reports that almost 9% of all of McDonald's U.S. locations have broken machines. McBroken's current data also indicates that more than ***22% of McDonald's ice cream machines in the Boston metropolitan area alone are out of service***.  Separately, the machine outages have cost QSR operators millions of dollars in lost revenue.  It is no surprise, then, that McDonald's franchisees have gone on the record to confirm the obvious: Taylor's "machines are temperamental and expensive to repair."

A.    Taylor Defrauds Customers by Programming Software Bugs that Cause Costly Malfunctions and Widespread Outages.

        It is surprising that Taylor has failed to remedy these failures given the fact that they damage McDonald's brand—and by extension Taylor's reputation because it manufactures the overwhelming majority of ice cream machines McDonald's uses.  But Kytch has gathered data sufficient to show that Taylor, itself, programmed the software bugs that cause the machines to fail.  These bugs have generated hundreds of millions of dollars in unnecessary repair and service fees for Taylor's lucrative service business.

        The data in Kytch's possession has also raised red flags regarding the safety of Taylor's machines.  For instance, reports show that up to 20% of Taylor's soft-serve machines currently operate with a "manual switch or similar device" that bypasses the machines' critical safety functions.[6]  This "bypass" directly violates NSF International's food safety requirements and may endanger patrons of QSRs that operate Taylor's soft-serve machines.  This is just one example out of the scores of defects that Kytch has detected.

---

[5] Data from Taylor's other product lines—from ice blenders to grills—indicate that these software issues are not confined to its ice cream machines.
[6] Kytch has confirmed that many Taylor machines have a jumper placed on the W2 pins on the rear of the machine that disables necessary safety mechanisms.  Documentary evidence confirms that Taylor has been aware of this hazard for years but has taken no action to correct this defect.



Until recently, Taylor has successfully concealed these defects by keeping separate menus: one for its own factory-trained technicians and a limited manager's menu for everyone else. The technician's menu displays accurate software information and permits technicians to access data that corresponds with the wide spectrum of operational capacities of each machine. But the customer menu provides only a rudimentary interface that does not permit franchisees access to critical features like glycol temperature controls, agitator operations, or compressor run times. The customer menu typically does not even identify the correct version of the software system that is actually running the machine. This makes it difficult—if not impossible—for independent technicians to troubleshoot or identify Taylor's programmed bugs. What's worse, without knowing which software version they are operating, franchisees are sometimes unable to identify the selection of features their machines can accommodate.

One recent update is emblematic of Taylor's software accessibility problem. Taylor rolled out a new upgrade that improves the machines' cleaning cycle. Customers soon learned, however, that they are unable to activate this feature without paying for a Taylor technician to complete a service. Its two-tiered menu system enables Taylor to charge millions of dollars in service fees just so customers can access software fixes that should have been installed, at no charge, in the regular course of business.

Other complaints from QSR operators further illuminate Taylor's servicing scheme. Earlier this year, a franchisee reported that his restaurant's soft-serve machine stopped working after a Taylor technician installed "software upgrades" without his knowledge or consent. Data Kytch collected from this particular machine indicates that the malfunctions were indeed caused by the technician's "upgrade." To add insult to injury, Taylor charged hundreds of dollars in "service fees" for the installation, even though it was the software upgrade that triggered the malfunction in the first place.

These failures are not just isolated events. The bugs in Taylor's programs are so severe and pervasive that one of its technicians in Norway recently posted a YouTube video explaining that several machine failures were caused by another one of Taylor's "software upgrades." This particular error—which Kytch flagged before the Norwegian video was posted—causes the soft-serve machine to freeze the mix in a manner that renders the machine unusable. This is only a small sample of the software bugs that Kytch has uncovered.

The key to Kytch's competitive edge in the food service industry is that all of its products are driven by data. Kytch now has data confirming that Taylor has engaged in years-long processes to "correct" myriad software bugs that were known to cause machine outages (and expensive service appointments). But instead of actually fixing these issues, Taylor permitted the errors to continue and profited from the increased service and repair revenue.

Based on the pervasiveness of Taylor's software bugs and performance failures, it is striking that Taylor's Operator Manual fails to make mention of these problems. But Taylor's consumer-facing documents shift the blame for its products defects to "improper assembly" or other "human errors," and run-of-the-mill mechanical issues. Taylor's failure to disclose the product defects is glaring, especially considering the fact that data Kytch collected from Taylor's machines confirms that Taylor has been aware of widespread software-based errors for years. And even though Taylor has published extensive marketing materials trumpeting their costly service and maintenance



packages, the company has taken painstaking efforts to conceal that its programming errors are endemic.

B. <u>Taylor's Scheme Violates Unfair Competition Laws and Anti-Fraud Regulations.</u>

The data in Kytch's possession—combined with statements and invoices provided by franchisee operators—establishes that Taylor's misconduct constitutes actionable fraud. Consequently, Taylor has legal exposure for a panoply of class and individual tort and statutory claims.

By way of example, a majority of state legislatures have passed consumer protection and anti-fraud statutes creating private causes of action for unfair business activities like those present here. In California alone there are at least four different statutory regimes that prohibit the various aspects of Taylor's scheme: (1) California False Advertising Law; (2) California Consumer Legal Remedies Act; (3) Computer Fraud and Abuse Act; and (4) California Computer Data Access and Fraud Act. These laws require manufacturers to pay substantial damages for failing to disclose "known safety hazards" and all known "central function defects."[7]

Product manufacturers have paid billions of dollars for failing to disclose defects. Companies have also been required to reimburse customers for repair costs and related damages that were caused by the defective software.

- LG recently settled a multi-million-dollar class action lawsuit over refrigerator defects after complaints alleged that the company knowingly sold refrigerators with cooling defects and subsequently failed to provide adequate repair services.

- Apple agreed to pay up to $500 million to settle class action claims that it slowed down iPhones to mask battery issues and drive users to purchase new devices.[8] The company paid an additional $113 million to states attorneys general.[9]

- Google agreed to pay $7.5 million after the company allegedly failed to disclose security defects that exposed users' data to third parties.[10]

With these cases in mind, we have instructed Frobot and Kytch to preserve all documents and information that may be related to civil claims that Taylor's customers may assert against Taylor for its fraudulent activities.  Kytch is prepared to produce evidence that will undoubtedly expose decades of Taylor's deceptive business practices that resulted in overcharging QSR operators millions of dollars—purportedly for service and maintenance—due to the bugs that Taylor intentionally programmed into its software.

---

[7] *See Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 980 (N.D. Cal. 2018) (plaintiff's allegation that defendant's defective software that "render[ed] those products incapable of use" was sufficient to support claims against the product manufacturer).

[8] *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827 (N.D. Cal. Feb. 28, 2020), ECF No. 416.

[9] Bobby Allen, *Apple Agrees to Pay $113 Million to Settle 'Batterygate' Case Over iPhone Slowdowns*, NPR (Nov. 18, 2020, 3:31 p.m.), https://www.npr.org/2020/11/18/936268845/apple-agrees-to-pay-113-million-to-settle-batterygate-case-over-iphone-slowdowns.

[10] *In re Google Plus Profile Litig.*, No. 5:18-cv-06164 (N.D. Cal. Nov. 19, 2020).



## II.    Frobot—and Subsequently Kytch—Developed Devices to Optimize Taylor's Machines.

Now that you are aware of the pertinent facts regarding Taylor's potential liability, we will briefly describe Frobot's collaborative efforts with Taylor and the subsequent development of Kytch.

Frobot was founded by Mr. O'Sullivan and Ms. Nelson to automate the delivery of frozen yogurt via standalone, unattended machines.  Frobot first approached Taylor in May of 2013 at the National Restaurant Association (NRA) Show in Chicago, Illinois.  Taylor expressed interest after Frobot informed leadership of its plans to develop a device to augment the capabilities of Taylor's frozen yogurt machines.  A few months later, Frobot presented its prototype at Taylor's headquarters in Rockton, Illinois.  Frobot's goal was to create a standalone product that would allow Taylor's machines to be used in retail spaces, completely unattended.  Frobot's groundbreaking self-service model required the company to undergo rigorous safety testing to ensure that safety measures were sufficient to guard against the hazard associated with serving dairy products to the general public.

Taylor's response to Frobot's presentation was positive, and the two companies entered into a cooperation agreement a short time later.  Years of product development followed. Throughout this process, Frobot and Taylor remained in close contact, and Taylor's feedback and cooperation played an integral role in developing Frobot.  Taylor also provided operator manuals and even shipped machine components to Frobot's headquarters to enable Frobot to collect data and ensure that the new device was 100% compatible with Taylor's existing software.[11]  Taylor representatives were intimately familiar with Frobot's safety protocols and its intention to obtain NSF food safety certification.

Frobot's efforts ultimately proved successful.  The company created the first device in the industry to serve non-prepackaged dairy products with zero human attendants.  Frobot showcased its product at Taylor's booths at the North American Association of Food Equipment Manufacturers (NAFEM) convention and at the NRA Show in 2017.  Pictures from that event are reflected below.




---

[11] October 2016 email correspondence with Taylor COO Jim Minard confirms these facts and describes the "extra control boards" that Taylor sent for data extraction purposes.



On the last day of the 207 NRA Show, abruptly and without explanation, Taylor informed Frobot that it was no longer welcome to showcase products at Taylor's booths.  Middleby acquired Taylor a short time later.

A.  <u>Kytch's Product Trials Prove Successful and Franchisees Flock to Purchase the Device</u>

Shortly after the unceremonious end to Frobot's relationship with Taylor, Jeremy O'Sullivan and Melissa Nelson launched Kytch in 2018 as a subsidiary of Frobot.  They fully expected Taylor's leadership to collaborate just as they had with Frobot; especially since Kytch's goals were aligned with Frobot's earlier mission to improve Taylor's machines.  Kytch was designed to identify and troubleshoot common malfunctions associated with soft-serve machines.  The idea is straightforward: Kytch is an add-on to existing machines that conducts real-time analytics, which allows Kytch to optimize the machine's energy saving, cleaning, and operating functionality.

Building off of Frobot's earlier successes, Kytch has even more potential to "transform dumb kitchens into intelligent, efficient ecosystems."  Kytch can be attached directly to the soft-serve machines; it connects to the internet via Wi-Fi and begins to monitor the machine's operations.  In effect, Kytch intercepts the dialogue between the front control panel and the machine's logic board, providing customers a user-friendly interface to navigate the communications.  Kytch was originally configured to complement one of Taylor's fully automated frozen yogurt machines.  The purpose of the first device was safety: it was designed to shut off service capabilities whenever the machine reached unsafe temperatures.  Over time, Kytch continued to develop its devices and expand capabilities to further optimize ice cream machines.

Kytch's functionality is depicted in the diagrams below.

**Real-Time Alerts**



7



**Customer Preference Data**



B. <u>Even Though Taylor Had a Longstanding Relationship with Kytch's Founders, Taylor Tried to Intercept Kytch's Product Covertly.</u>

Kytch launched "Kytch Solution" in April 2019 to optimize Taylor's soft-serve machines. Mr. O'Sullivan and Ms. Nelson presumed that this would have piqued Taylor's interest, and they were somewhat surprised when Taylor's leadership did not contact them to discuss the potential to collaborate. But Kytch's team learned a short time later that Taylor took painstaking efforts to surreptitiously purchase Kytch Solution.

The first of these efforts took place in April of 2019 when a low-level Taylor employee named Heather Jordan attempted to order Kytch Solution. Less than a month later, Taylor attempted another purchase, this time through its outside legal counsel, Stephen Smith of Brinks Gilson. But this was just the beginning of Taylor's mission to obtain Kytch Solution. Documents revealed in our investigation indicate that Taylor also hired at least two investigators—Madeline Taylor and Porscha Imperial of Marksmen, Inc.—who used false names to try to purchase Kytch's device. In total, Taylor representatives—often using aliases—attempted to buy Kytch Solution almost a dozen times. Relatedly, statements from a QSR operator in the southeast region suggests that Taylor has somehow taken possession of one or more of Kytch's device and related proprietary information. **Please instruct Taylor to return Kytch's property without delay.**

In May of 2019, the company rolled out its first device, Kytch Solution, on a limited trial basis (the "Kytch Trial") at select McDonald's and Burger King locations in the United States. Each participant in the Kytch Trial executed a binding agreement, whereby they were granted limited rights of use to evaluate and test the product. The Agreement also includes strict non-disclosure requirements.

Customer acquisition, using the Kytch Trial, was incredibly successful—until Taylor's defamatory publications about Kytch's product. QSR operators were excited as they watched, in real time, as Kytch Solution provided an instant value-add. Despite Taylor's programmed bugs, Kytch improved the machines' uptime and significantly reduced outages and related maintenance costs. Trial participants gave rave reviews because Kytch Solution was effective, and the product delivered results that enabled franchisees to "keep [their] machine[s] up and running." One franchisee explained that Kytch is so effective because it "provides increased awareness and results in faster

8



reaction times when a problem does occur." He went on to say that Kytch reflects "best thinking as it relates to the industry," and that "this device can reduce complexity in [] restaurants, make the lives of [franchisee's] teams easier, and help drive cash flow" by reducing unnecessary outages.

Demand for Kytch exploded as word started to spread that Kytch Solution actually works around many of Taylor's software bugs. Kytch quickly enrolled trial participants in restaurants in Arkansas, California, Connecticut, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Washington, and Wisconsin. As a result of this massive expansion, Kytch quickly became the largest non-approved vendor in the McDonald's system.

By all appearances, Kytch Solution was a viable remedy to many of the problems that had troubled soft-serve machines and frustrated customers for years.



### III. As Kytch Continued Its Exponential Growth, Taylor Perpetrated an Anti-Competitive, Defamatory Smear Campaign Against Kytch because Its Success Threatened to Expose Taylor's Service Scheme.

The primary reason demand for Kytch's devices skyrocketed is that the products pay for themselves in two independent ways. *First*, by reducing outage times, Kytch Solution enables QSR operators to increase revenue through an uptick in soft-serve-related purchases. *Second*, by lowering



repair costs and enhancing troubleshooting, Kytch is able to save QSR operators significant overhead associated with costly service repairs.  Thus, QSR operators have welcomed Kytch's innovative tools.

It would seem that Taylor would encourage this advancement because Kytch developed a work-around for critical bugs that have caused mass interruptions of its machines.  Not so.  When Taylor realized how quickly Kytch was growing, it engaged in an anti-competitive misinformation campaign to (1) falsely accuse Kytch Solution of being a safety hazard and (2) unlawfully threaten to void product warranties for all QSR operators that used Kytch's add-ons.

A.   Taylor Spreads Misinformation about Kytch to Burger King Representatives.

Kytch first learned that Taylor representatives were making false claims about the safety of Kytch Solution in October of 2019, shortly after Burger King hosted its Global Convention in Miami, Florida.  By that time, Kytch had expanded to a number of Burger King franchisees across the country, and the Kytch Trial was gaining traction as it increased restaurant operators' profitability by driving up sales of soft-serve ice cream products.  In the days after the convention, Kytch discovered that Taylor pressured Burger King franchisees to sever ties with Kytch by citing phony safety and warranty concerns that Taylor invented out of whole cloth.  Multiple witnesses have also confirmed that Taylor made similar disparaging remarks to The Coca-Cola Company and that Taylor plans to develop its own real-time monitoring device—which appears to be strikingly similar to Kytch's products—that will likely be rolled out in 2021.

Myriad Burger King franchisees withdrew from the Kytch Trial as a result of Taylor's coercion and unfair attacks against my client.  Put simply, Taylor's defamatory statements ruined Kytch's relationships with Burger King's QSR operators.  Despite their initially positive impressions of the product, customer after customer explained that the pressure from Taylor caused them to cancel their contracts with Kytch.

B.   Taylor Threatened to Void Kytch Customers' Warranties and Made False Claims Regarding the Safety of Kytch's Products.

Emboldened by its success with Burger King and even more determined to neutralize Kytch's growth, Taylor continued to peddle lies about Kytch to McDonald's franchisees via so-called "safety alerts."  Earlier this month, Taylor caused an **"IMPORTANT NOTE"** to be published to every single operator of the 13,000 McDonald's restaurants in the United States.[12]  Even though the **NOTE** was sent under the guise of promoting safety, the messages contain overt threats that Taylor will void product warranties unless QSR operators agree to remove Kytch Solution from their machines.

> **IMPORTANT NOTE:** We have become aware that a few operators may be using an unapproved aftermarket technology, Kytch, on their Shake Sundae machine.  As a reminder, any operator that is using this aftermarket "add-on" to any of their machines, will completely void an existing OEM equipment

---

[12] It is of no consequence that McDonald's transmitted the defamatory message.  Under well-settled law, a defamer is liable for damages caused by repetitions that were reasonably foreseeable, or the natural and probable consequence of his original statement.



There is simply no basis for Taylor to represent that using Kytch would retroactively void Taylor's express and implied product warranties.  But after threatening to rescind these warranties, Taylor falsely claimed that Kytch's devices were hazardous and that they are known "to cause serious human injury."

> Taylor [has] recently determined that the Kytch device creates a potential very serious safety risk for the crew or technician attempting to clean or repair the machine, given that the Kytch controller may allow the device to change its operation or continue running during cleaning or maintenance, in a manner that can cause serious human injury.
>
> **As such, McDonald's strongly recommends that you remove the Kytch device from any machines and discontinue all use, and is reminding you that any continued use is not approved and is at your sole risk.**

This is pure fiction.  There is absolutely zero support, whatsoever, for Taylor's claim that Kytch "creates a potential very serious safety risk" or its accusation that Kytch "can cause serious human injury."  Tellingly, Taylor has failed to even attempt to corroborate its prevarications about Kytch's safety record.  In fact, Kytch underwent extensive product testing and certification at Intertek during product development to ensure that it satisfies all Underwriters Laboratories (UL) electrical safety requirements.[13]  There have not been any reported "human injur[ies]" of any kind that were caused by Kytch's devices.  To be clear, Kytch does not permanently alter the machine, and it certainly does not disable or otherwise negate any of the machine's factory-installed safety mechanisms.  The opposite is true:  Kytch warns the user when a particular component of the machine may fail and it monitors how often and effectively each machine is cleaned, thus optimizing operating conditions.  Moreover, Kytch was designed to complement the existing safety tools, including but not limited to quality control of the ice cream's temperatures.

The **"IMPORTANT NOTICE"** fails to provide substantive details regarding what supposedly makes Kytch unsafe to operate.  It does, however, claim that Kytch is "creating potential equipment reliability issues without the restaurant's knowledge or ability to stop it."  This is a complete fabrication.  Rather, ***Taylor*** has intentionally created "equipment reliability issues" for years, and its service department has charged hundreds of millions of dollars in fees for repairs that Taylor itself caused.  Taylor's claim that Kytch's remote-control capabilities present a safety hazard is also manifestly false.  Kytch's functionality only permits users to control a machine in the same way that the machine is operated without Kytch.  For example, just like a human operator, Kytch can only utilize the same functions that are available to workers using a Taylor machine ***without*** Kytch.  In other words, Kytch is restricted by all of the same safety mechanisms that constrain human operators.

The defamatory statements that Taylor published have had a devastating impact on Kytch's reputation and its business on a going-forward basis.  After Kytch's customers learned about Taylor's false claims regarding Kytch's safety record and Taylor's threat to cancel their warranties, they, very predictably, severed ties with Kytch.

---

[13] Kytch conforms to ULL STD 62368-1 and has successfully completed EMC testing consistent with the requirements of 47 CFR Subpart B §§ 15.101 - 15.123.



*** 

You now have written notice of the falsity of Taylor's claims that Kytch is a "very serious safety risk" that "can cause human injury." And those claims are not only false, but defamatory, and because they accuse Kytch of selling a product that endangers consumers' health, they are defamatory *per se*. Moreover, it is clear that Taylor made these statements knowing that they are false or, at minimum, with reckless disregard for their falsity, *i.e.*, with actual malice.

**Kytch formally demands that Taylor immediately retract its false statements, including by removing them from any locations in which they are published, and cease and desist from publishing or republishing any of them.** Failure to issue a retraction will constitute additional evidence of actual malice.

We trust that you understand the gravity of the issues raised in this letter and will treat them with the attention and seriousness that Kytch and the public deserve. Kytch has dedicated itself to being a responsible company that adheres to the highest standards of business conduct and ethics, and by publishing false and defamatory statements and implications misrepresenting the safety of Kytch's product, you have caused (and continue to cause) substantial damage to Kytch.

Finally, in light of the above and until all issues regarding Taylor's unlawful conduct are fully resolved, we require that you preserve and retain all documents, data, and electronically stored information relating in any way to Frobot, Kytch, their products, or your attempts to damage Kytch's business reputation and professional standing. These items should be preserved regardless of the medium, format, or device on which they are stored or hosted, and regardless of whether they appear in documents, drafts, notes, emails, text messages, voicemail messages, social media posts, or in any other form. Failure to adhere to this request could subject you to significant penalties, including claims and sanctions for spoliation. Please let us know if this request is in any way unclear.

This is not a full statement of Frobot's or Kytch's rights and remedies, all of which are expressly reserved. We look forward to your prompt response.

Sincerely,

Elizabeth M. Locke, P.C.

Daniel P. Watkins

12